UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

   - v. -                         :        **SENTENCING MEMORANDUM**

**OCTAVIA MANIGAULT,**             :        **07 Cr. 951 (DLC)**

       Defendant.          :

- - - - - - - - - - - - - - - - - x


Dear Judge Cote:

    I write on behalf of my client, Octavia Manigault, in anticipation of her sentencing, which is scheduled for January 18, 2008.  For the reasons set forth below, I urge the Court to impose a term of five years of probation.

    I attach for the Court's consideration in connection with sentencing: Letter of Octavia Manigault, Ex. A; Letter of Cameron M. Cordon, Ex. B; Letter of Leslie Young, Ex. C; Letter of Karen P. Williams, Ex. D; Letter of Linda V. Yanov, Ex. E; Letter of Pastor Wayne R. Crozier, Ex. F; Letter of Pamela S. Moore, Ex. G; Letter of Gregory G. Mason, Ex. H; Letter of Monica Moore, Ex. I; Letter of Barbara Black, Ex. J; Letter of Patricia A. Rosebourgh, Ex. K.

## I.    Objections to the Pre-Sentence Report

    The defense has several objections to the Pre-Sentence Report ("PSR").

    First, the cover sheet lists Ms. Manigault as having three dependents; as noted later in the report, Ms. Manigault has six dependents.  See PSR ¶¶ 38-39.

    Second, paragraph 8 of the PSR lists the relevant number of tax returns as 285 and the loss amount based on relevant conduct as $600,000.  See also PSR ¶¶ 10, 17. These numbers are based on uncharged conduct; Ms. Manigault was indicted and pleaded guilty to preparing 3 tax returns with a tax loss of $10,773.  Ms. Manigault has admitted to both the IRS and probation that she prepared false tax returns beyond the three with which she was charged in the Indictment and she wishes to accept responsibility for all of her wrongful conduct.  However, the defense is concerned lest Ms. Manigault be inaccurately held responsible for

tax returns actually prepared by other people using the same method, particularly given that the IRS showed Ms. Manigault such returns during her proffers.  Accordingly, the defense objects to the inclusion of tax returns and loss amount that has not been shown to be connected to Ms. Manigault.  Specifically, as to the number of tax returns, the defense believes the appropriate number is 242 returns, not 285.  The Government provided the defense with a spreadsheet of "relevant conduct" that lists only 259 returns, not 285.  Of these 259 returns, 17 of them belong to taxpayers whom Ms. Manigault does not recall.  The defense has not been provided with any of the actual tax returns for the uncharged conduct, so this objection is based on the review of the spreadsheet provided by the Government.  With respect to the loss amount, these 17 tax returns total $37,215 in refunds; accordingly, the defense believes the loss amount is appropriately set at $562,785, not $600,000.

Finally, the Pre-Sentence Report recommends a sentence of 37 months imprisonment on each count to run concurrently with each other (at page 19).  Such a sentence would be illegal, because the statutory maximum for each count is 36 months of imprisonment.

## II.  Factual Background

In the four years since she committed the offense conduct, Octavia Manigault has fought her way to a stable, productive life in which she is raising six children, attending college, running a community dance program, and is deeply involved with her church.  She has entirely self-rehabilitated, as demonstrated by her extraordinary acceptance of responsibility, her assistance to the Government in the investigation and prosecution of this case, her steady employment, her remarkable parenting, and her contributions to her community and her church.  Her rehabilitation occurred as a result of her own desire to change her life, to move away from the environment that had led her to commit the offense conduct, and to give her children a better future; she did all of this prior to being charged with any crime and she continues to do it because of her remorse and her deep desire to live differently.  As Ms. Manigault writes to the Court: "I realize how wrong I was and that Aiding and Assisting the Preparation of False and Fraudulent Income Tax Returns is a very serious crime.  I have accepted full responsibility for my behavior.  Since I've given my life to the Lord on June 1, 2005, I have strived to live my life according to his will by being there and helping my family and other fellow brothers and sisters in Christ.  Due to this tremendous change in my life, I can promise the court that I will continue to live a crime free life.

. . . I cannot change my past, but I can change my future."
Letter of Octavia Manigault, attached as Ex. A.

Born in 1978 to Francis and Elizabeth Manigault, Octavia is
the fourth child of six children raised in a home rife with
domestic violence and colored darkly by their mother's severe
addiction to crack and alcohol. Her father worked long hours at a
sanitation plant in New Jersey, leaving the house every day at 5
a.m., returning from work in the late afternoon, then leaving the
house again, as soon as he could, to avoid conflict with the
children's mother.  From a very young age, Octavia, her five
siblings, and their cousins were frequently home alone.  Her
father at times resorted to violence toward her mother in an
effort to keep her from abusing drugs and staying out on the
street until all hours of the night.  Her father beat her
brothers to try to keep them in line.  Her mother would beat the
girls when she was high or drunk.  The kids would try to block
their father from beating their mother by physically placing
themselves between the two parents.

Ms. Manigault's mother's addiction and anti-social behavior
worsened over time.  By Ms. Manigault's early adolescence, her
mother was selling the family's possessions, including pieces of
furniture, when their father was not home, in an effort to
support her crack habit.  Ms. Manigault's two brothers
unfortunately followed their mother's path, and began first using
crack at a young age, and then selling it to support their
habits.  There was often little food in the house, because Ms.
Manigault's mother spent her public assistance check on drugs.
Ms. Manigault's father tried hard to make sure the children had
something to eat and something warm to wear, but his paycheck
could not stretch far enough to cover eight people, particularly
given Ms. Manigault's mother's actions.

Until she was an adolescent, Octavia dealt with her
difficult home life by keeping to herself, staying at school for
as long hours as possible, taking music classes and participating
in every school assembly.  By the time she entered high school,
however, she had lost interest in studying, because no one in her
life cared how well she did, or even where she was.  She dropped
out in the tenth grade, after only six months.  She fortunately
never used alcohol or drugs, unlike her siblings, but from the
time she left school, she bounced from one menial part-time job
to another, searching for something meaningful.

Her mother at one point moved out and moved in with another
man, and her father became involved with another woman, leaving
the children entirely to fend for themselves.  Ms. Manigault

-3-

finally left the family home at age 20, and began trying to get
an education for herself, attending Lehman College and Monroe
College in the Bronx. Ms. Manigault is the first person in her
family to ever attend college. Indeed, her parents both have
only elementary school educations. She moved in with her
boyfriend, Cameron Cordon, and soon became pregnant with their
first child, C.C. Ms. Manigault was already caring for her
nephew, M.B., who was then four years old, because his father
(Ms. Manigault's brother) was incarcerated. M.B. is learning
disabled. Too financially unstable to support her newborn infant
and M.B., Ms. Manigault moved back into her parents' home.

       Desperate for money, Ms. Manigault succumbed to the
temptation she had previously resisted, with which she had been
surrounded her entire life, to engage in criminal conduct for
money. She began to prepare false tax returns for a fee for
people in the neighborhood. These returns falsely stated that
the individual for whom the return was prepared was working at a
low-income job, thereby entitling the filer to the earned income
credit, when in fact the individual was unemployed. Ms.
Manigault was shown how to prepare such tax returns by a woman in
the neighborhood who was already engaged in preparing tax returns
in this manner and who made a "dummy" form for Ms. Manigault to
copy from and instructed her how to claim the earned income
credit for individuals, giving her detailed directions as to what
figures and forms to use. Ms. Manigault offered to file these
forms for people in the neighborhood who were not working, so
that they would receive refund checks. These people were aware
that they would be receiving refunds to which they were not
entitled. Ms. Manigault, in turn, received a fee for each refund
that was received. She spent the money she earned on taking care
of her children, who now included a second child with Mr. Cordon,
a daughter, A.C. Various relatives helped Ms. Manigault fill out
the forms, including her niece, L., whom Ms. Manigault often
cared for during this period. Ms. Manigault never explained to
her niece what the returns were, but, rather, spoke of it as her
work that her niece was helping her with by copying numbers from
the dummy form to the returns. Ms. Manigault engaged in the
preparation of these tax returns for approximately three years.

       The IRS discovered the fraudulent tax returns prepared by
Ms. Manigault in early 2004. She was first contacted by IRS
agents in April 2004, and she immediately admitted her
wrongdoing, speaking voluntarily and without counsel to the
agents, and giving a full statement regarding her offense
conduct.

       It was during this same period that Ms. Manigault had her

-4-

only prior contact with law enforcement.  She was arrested in
2000 for cashing a duplicate refund check, after she claimed she
had lost the first one she received, but then cashed both of
them.  She pleaded guilty to petit larceny, received a
conditional discharge and was sentenced to three days of
community service.

In 2004, Ms. Manigault moved to West Virginia to break away
from the troubles of her past – her criminal conduct, her family
uproar, and the financial instability.  She forged this
opportunity to have a true community and return to the youthful,
idealistic, self she was before she lost hope in high school.
She has made the most of it by being open about the mistakes of
her past and doing all within her power to not repeat them by
creating a stable, moral, life.

As soon as she and her children arrived in West Virginia,
she began working full-time through a temporary employment
agency, United Talent, and enrolling in every job skills class
she could find so that she could obtain a good job. She worked
steadily and with a strong work ethic.  See Letter of Leslie
Young, attached as Ex. C.

Ms. Manigault made it a priority to locate the best
educational opportunities for two children, C.C., then age 4, and
A.C., then age 2, and her nephew, M.B., then age 10, over whom
she has legal guardianship. She became deeply involved in their
schooling and in the local Head Start program in which the
younger children are enrolled.  As the Director of the local Head
Start program writes, Ms. Manigault "has participated on the Head
Start Policy Council as a representative for two years.  During
the recent year, Octavia has been elected to be a local officer
of the Kanawha County Schools Head Start Program and at the
annual meeting of the West Virginia State Head Start Association
she was one of the parent representatives to be elected as an
alternate on the State Board.  Octavia is a dedicated Head Start
mother.  She is always willing to attend meetings and training
sessions to improve her abilities. . . . Octavia is trying hard
to put the past behind her and begin a new life of integrity and
honor.  She is a good example for her children and the other
parents in the Head Start Program."  Letter of Karen P. Williams,
attached as Exhibit D.  See also Letter of Linda V. Yanov, Family
Resource Worker, attached as Ex. E.

She found a support network in Charleston and has herself
become an integral part of the community. After settling there,
she pursued a life-long dream and founded a community dance team
called Tru-Talent, as an outlet for low-income children between

the ages of 11 to 16, with the hope of giving them a setting free of peer pressure and a sense of community.  It started with 5 girls; now there are 25 to 30 regular members, both boys and girls, who compete in regional dance contests every January and practice once a week throughout the year.  As the mother of three of the girls who participate in the dance team writes, Ms. Manigault "does this out of her love for children and dancing ... [she] has been a great role model for many children. . . . I believe she has learned from her past mistakes and has been working to better her life through community involvement and bettering her education to be able to provide for her family. Ms. Manigault is a true pioneer in her community and deserves the chance to continue on her crime free path." Letter of Monica Moore, attached as Ex. I.  In this, as in the other parts of the life she has created since the offense conduct, Ms. Manigault has focused her energies not just on bettering herself but also on combating the influences that led her and her siblings into criminal activity, so that her own children and the children of her community have different opportunities and examples.

After they moved, Ms. Manigault also for the first time began to attend church, something her family had never done, and in 2005, she became a Christian.  Her pastor writes that "she is a living example of a young lady with a reformed life who is making a positive impact in our community.  When I look at Octavia and see the strides she has made, it encourages me to keep reaching out to other young adults." <u>See</u> Letter of Pastor Wayne R. Crozier, attached as Ex. F.  Ms. Manigault brings all six children to church every week, and teaches Sunday School. She speaks openly of the mistakes of her past and encourages others to turn their lives around.  <u>See</u> Letter of Pamela S. Moore, attached as Ex. G.

Beginning in March 2005, Ms. Manigault met and spoke with the IRS on a voluntary basis, assisting with the investigation of her offense conduct and of others involved in preparing fraudulent income tax returns in the same manner.  She went through the details of her conduct and reviewed numerous tax returns with the IRS agents, with no promise of immunity or assistance.  She also specifically identified other people in the same neighborhood who were using the same method of preparing false tax returns.  She drove up to New York from West Virginia for these meetings when she was asked to do so by the IRS.  Ms. Manigault did not know whether the investigation would result in her prosecution or not, but she was willing to offer her assistance, and did so, at every stage, regardless of the outcome.

Her relationship with Cameron Cordon, her boyfriend of eight and one-half years, continued, and they had a third child, L.C. in 2006. Mr. Cordon struggled to break free of his prior involvement with drugs and is currently incarcerated on a marijuana charge. Ms. Manigault is now caring for their three children, her nephew, and two of Mr. Cordon's children from a prior relationship, C.J.C., age 17, and C.M.C., age 15. As Mr. Cordon writes to the Court, he too wants to be on a better path and has used his time in custody to seek counseling and education. <u>See</u> Letter of Cameron M. Cordon, attached as Ex. B. Mr. Cordon also passionately describes the changes he has seen in Ms. Manigault: "Octavia may have been involved in making some bad choices in her past, but in the past four years, she has made a three hundred and sixty degree turn in her life. " <u>Id.</u>

In August 2006, Ms. Manigault began course-work toward a B.A. in business management at Western Virginia State University, a historical black college. She is a work-study employee at the Human Resources Department of her college, working between 15 to 20 hours weekly. As her supervisor writes, Ms. Manigault is hardworking and an asset to the office. <u>See</u> Letter of Barbara Black, attached as Ex. J. She has also involved herself with her college's community service program, and is now Vice-President of the local chapter. <u>See</u> Letter of Gregory G. Mason, attached as Ex. H. The Program Coordinator for her college's support services for first-generation college students writes of how Ms. Manigault has impressed her, as a student, as a community member, as a churchgoer, and as a parent. <u>See</u> Letter of Patricia A. Rosebourgh, attached as Ex. K.

Because of all the changes she has made in her life, Ms. Manigault has become the mainstay of her family. While her mother is finally clean of drugs, after a collapse that sent her to the emergency room and required her to be hospitalized for some months, she is now on oxygen 24 hours a day and has Cardiac Obstructive Pulmonary Disease, asthma, diabetes and high blood pressure. Octavia's sister Vanessa lives in Charleston, South Carolina, works at a middle school, and has three mentally challenged children whom she cares for. She looks to Ms. Manigault for guidance and emotional support. Her two older brothers, Jeffrey and Francis, are incarcerated, as they have been for most of their adult lives, on drug charges stemming from their own serious drug addictions, and Ms. Manigault is the legal guardian of Jeffrey's son, M.B. Her younger sister, Eidesha, lives in Charleston, West Virginia, near Ms. Manigault, and is currently working at a McDonald's, the first job of her life. Her youngest sister, Mattise, who is now 21 years old, is mentally challenged and lives with her parents. Ms. Manigault is

the sole caretaker of her and Mr. Cordon's three children, ages 2, 5, and 7, of her nephew, M.B., age 13, and of Mr. Cordon's two sons from prior relationships, ages 15 and 17.

In July 2007, nearly two and one-half years after Ms. Manigault had admitted the full extent of her conduct to agents and begun assisting them in the investigation of the case, and nearly three and one-half years after the offense conduct ended, the U.S. Attorney's Office notified her that it had decided to commence a prosecution. For its own administrative reasons, the Government preferred to proceed by indictment, despite Ms. Manigault's willingness to waive indictment, and in October 2007 she was charged in a three-count indictment with assisting in the preparation of three false tax returns filed from 2002 to 2004 for a total tax loss amount of approximately $10,000. The next week, Ms. Manigault drove to New York from West Virginia, and surrendered to the IRS. She pleaded guilty that same day to the three-count indictment. She gave an honest and remorseful allocution to this Court and was subsequently released on her own recognizance with no supervision.

In the months since her guilty plea, Ms. Manigault has continued on her path of rehabilitation, finishing the fall semester at college, training her dance team for the January 2008 competitions, working at her college job, and raising her children._

## III.  **Applicable Sentencing Law**

When imposing sentence, the Court is required to consider all of the factors set forth in 18 U.S.C. § 3553(a) in determining what is a reasonable sentence in each individual case. See United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed. 2d 621 (2005); see also United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006).

Section 3553(a) directs the Court to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

   (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)  to afford adequate deterrence to criminal conduct;

   (C)  to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational
           or vocational training, medical care, or other
           correctional treatment in the most effective
           manner.

        To arrive at such a sentence, the Court is further directed
to consider: (1) the nature and circumstances of the offense and
the history and characteristics of the offender; (2) the kinds of
sentences available; (3) the kinds of sentence and the sentencing
range established in the Sentencing Guidelines; (4) policy
statements issued by the Sentencing Commission; (5) the need to
avoid unwarranted sentence disparities among similarly situated
defendants; and (6) the need to provide restitution to any
victims of the offense.  See 18 U.S.C. § 3553(a)(1), (a)(3)-(7).

        As the Supreme Court held in Rita v. United States, 127
S.Ct. 2456, 551 U.S. __, 2007 WL 1772146, *9 (U.S.), and re-
emphasized in Gall v. United States, 128 S.Ct. 586 (2007) there
is no legal presumption that the sentence called for by the
advisory Guidelines, one of the Section 3553(a) factors, should
apply in the district court.  Rather, in every case, the
sentencing court will "not presume that the Guidelines range is
reasonable," but, instead, "must make an individualized
assessment based on the facts presented."  Gall, 128 S.Ct. at
597.

        In addition, the Second Circuit has made clear that a
defendant's efforts to cooperate, whether or not they result in a
motion by the Government, are relevant to a court's evaluation of
the Section 3553(a) factors, including, but not limited to, the
"history and characteristics" of the defendant and whether a
disparate sentence from otherwise similarly situated defendants
is warranted based on the remorse and rehabilitation evinced by
efforts to cooperate.  United Fernandez, 443 F.3d 19, 33-35 (2d
Cir. 2006).

## IV.  Guidelines Calculation

        The applicable advisory Guidelines range in this case is 37
to 46 months of imprisonment, based on an estimated tax loss of
over $400,000, and a criminal history category of I.  It is
noteworthy that the advisory Guidelines range for the conduct
charged in the Indictment, to which Ms. Manigault pleaded guilty,
is 8 to 14 months, based on a tax loss of approximately $10,000
for the three false tax returns for which Ms. Manigault was
charged by a grand jury.  The additional hundreds of tax returns

and hundreds of thousands in dollars in tax losses that increase the advisory range are based on conduct to which Ms. Manigault voluntarily admitted in pre-charge interviews with the IRS, in the course of her assistance in the investigation of this case over the last three years.[1] Here, the Government chose to indict Ms. Manigault on only three tax returns, but now seeks to punish her for hundreds based on the concept of "relevant conduct." While Ms. Manigault, as she has consistently demonstrated, wishes to accept full responsibility for her conduct, the Government appears to be stretching relevant conduct to its limits. Moreover, in this case the Guidelines range exceeds the statutory maximum of three years for each count. While it is of course possible for the Court to run the sentence for each count consecutively, a consecutive sentence for closely related conduct is ordinarily only imposed in extraordinary circumstances where a punishment above the statutory maximum is deemed necessary because of the aggravated nature of the conduct or the dangerousness of the offender. This is not an appropriate case for a consecutive sentence.

**V.   Any Term of Imprisonment Would Be Greater Than Necessary To Deter Ms. Manigault, Continue Her Rehabilitation, And Promote Just Respect For The Law**

The only statutory factor weighing in favor of an incarcerative sentence is the advisory Guidelines; each of the other factors weighs strongly against incarceration and in favor of a probationary sentence. Indeed, Ms. Manigault is similarly situated to the defendant in the recent Supreme Court decision in Gall upholding the sentence and reasoning of the sentencing judge in imposing a non-Guidelines sentence:

---

[1]The defense has objected to the loss amount of approximately $600,000 and the calculation of the number of tax returns as 285, which is set forth in the Pre-Sentence Report. These numbers are based on information provided by the Government to Probation. First, the spreadsheet of "relevant conduct" provided by the Government to the defense lists only 259 returns, not 285. Second, that spreadsheet includes 17 tax returns (belonging to 14 taxpayers) that the defendant does not recall preparing. The defense has not received the actual tax returns for any of the uncharged conduct. The 17 tax returns for these 14 taxpayers total $37,215 in refunds, an amount that does not change the Guidelines range.

"Any term of imprisonment in this case would be counter
effective by depriving society of the contributions of
the Defendant who ... understands the consequences of
his criminal conduct and is doing everything in his
power to forge a new life.  The Defendant's post-
offense conduct indicates neither that he will return
to criminal behavior nor that the Defendant is a danger
to society.  In fact, the Defendant's post-offense
conduct was not motivated by a desire to please the
Court or any other governmental agency, but was the
pre-Indictment product of the Defendant's own desire to
lead a better life."

552 U.S. ___ , 128 S.Ct. at 593 (quoting the district court
opinion), see also id. at 602 ("The District Court quite
reasonably attached great weight to Gall's self-motivated
rehabilitation, which was undertaken not at the direction of, or
under supervision by, any court, but on his own initiative.  This
also lends strong support to the conclusion that imprisonment was
not necessary to deter Gall from engaging in future criminal
conduct or to protect the public from his future criminal acts.
See 18 U.S.C. §§ 3553(a)(2)(B), (C).").

    Ms. Manigault's history and characteristics show that she is
not only capable of living a law-abiding life – as she has been
for the last three and one-half years – but capable of, and
committed to, contributing greatly to her community.  She pulled
herself and her children out of a corrosive environment in which
most of the people she knew were either, at worst, involved with
criminal activity, or at best, not working and not contributing
positively to society.  She had the strength of character and the
moral compass to realize she and her children had to be in a
different environment to flourish and she has created a warm,
loving, stable home for her three biological children, her
nephew, and her two step-children.  She has gone from being a
person who stayed at her parents' house filling out false tax
returns with the help of family members to being a community
leader, the person who rescues other people's children from
difficult situations and builds their self-esteem.  She is
respected at her college, her work, her children's schools, her
church, and her community.  This respect is not based on a false
image: as the letters written on her behalf reveal, Ms. Manigault
has not hidden her past mistakes.  This respect is based on her
speaking the truth, working hard to make up for her past,
recognizing her strengths and weaknesses and devoting herself to
change.  She is an extraordinary person.  As her boyfriend

writes, some large part of this appears to be attributable to her having become a true parent, and in caring deeply for those who depend upon her, she has recognized that she does not want to repeat the mistakes of her childhood.

The offense conduct occurred in an entirely different context. She had a newborn child and responsibility for her nephew and could see no way to cope. She was shown by another person what appeared to be an easy way to make money – doing other people's false tax returns. The temptation was great, her resistance low, and her self-esteem even lower. She had no one around her to say "don't do that," no one to care whether she did right or wrong. Her mother was still a crack addict, living much of her life on the streets. Her father was struggling to keep their apartment. Her two brothers were in and out of jail. Her sisters were living all over the place, except her youngest who is severely learning disabled. She did not know anyone at that time with a stable job or a good education. She did not believe she could have a different life. So she did false tax returns for people to make money. She knows this was wrong and will never again break the law. She expressed this to the Court at her plea allocution, to the Probation Officer during her Pre-Sentence Interview, and to the IRS agents repeatedly. Ms. Manigault's use of a minor, which involved allowing her adolescent niece, whom Ms. Manigault frequently took care of, to transpose the numbers from the dummy form to the tax returns, is, of course, inherently, worrisome; however, it is important to note that her niece was not aware that any criminal activity was being committed, never signed a tax return, and viewed what she was doing as helping her aunt with her work. Ms. Manigault allowed her niece to do this not to cover up anything or to enhance the crime, but simply because her niece, as with many children, wanted to be part of what her aunt was doing. She is truly remorseful for all of her offense conduct, as her letter to this Court reflects. <u>See</u> Letter of Octavia Manigault, attached as Ex. A.

Ms. Manigault has shown her remorse not only through her exemplary life since the offense conduct, but also through the manner in which she has dealt with this investigation and prosecution. From the time she was first contacted by the IRS in April 2004, she admitted her wrongdoing. When the IRS subsequently asked to meet with her for a full proffer of her conduct, years prior to the bringing of any charge, she drove up from West Virginia, arranging for babysitters for her children, and met with the agents for hours, going over tax returns and

other documents, describing how she committed the offense and providing the information she had about others engaged in the same conduct. This cooperation, which is not the subject of a 5K motion by the Government, because, as far as the defense has been made aware, it has not led to additional arrests, clearly assisted the IRS in its investigation and eased its prosecution. It should be taken into account in sentencing Ms. Manigault because it demonstrates concretely both her remorse and her rehabilitation. See Fernandez, 443 F.3d at 33-35. Moreover, when the Government decided to indict her, she again drove up from West Virginia, voluntarily surrendering and pleading guilty the day of her arraignment.

A lot has changed for Ms. Manigault in the last three and one-half years. She is now responsible for six children. She is attending college. She has become a Christian, which has given her both a strong community of people to support her in living a law-abiding life and also a moral guide by which to check her own behavior. She is enmeshed in a support network of responsible, law-abiding people who know her past and want to help her stay on the path to a better future.

The Court has the authority to sentence Ms. Manigault to a lengthy probationary sentence. Such a sentence will allow Ms. Manigault to continue on her exemplary path, but will simultaneously permit this Court to ensure – through supervision – that Ms. Manigault does not fall prey to temptation again.

A probationary sentence will also allow Ms. Manigault to continue to care for her three biological children, who are now 2, 5, and 7 years old, her nephew, now 13 years old, and her two step-children, ages 15 and 17. If Ms. Manigault were incarcerated even for a relatively short period of time the impact on her children would be severe. She has no family member capable of caring for them. She is their sole financial and emotional support. While many defendants have family responsibilities upon which an incarcerative sentence would impact negatively, the number of children at issue here, the very young age of her biological children, and the fact that her willingness to care for the three older children was all that saved them from years in the foster care system, all augur in favor of a non-Guidelines sentence on this basis. These children are extremely vulnerable. Even with Ms. Manigault's income, they live just above the poverty line. All six have lost their fathers to incarceration, and the three older children have been abandoned by their biological mothers. Two of them have been

diagnosed with learning disabilities. Ms. Manigault's family
circumstances do not decrease her culpability, but it is in just
such circumstances that, even before the Guidelines were found to
be advisory, courts have been reluctant to "wreak extraordinary
destruction on dependents who rely solely on the defendant for
their care." Johnson, 964 F.2d 124, 129 (2d Cir. 1992)
(affirming downward departure granted to defendant, a single
mother raising four children). See also, e.g., Galante, 111 F.3d
1029 (2d Cir. 1997) (affirming departure for defendant supporting
wife and two children); United States v. Rose, 885 F. Supp. 62
(E.D.N.Y. 1995) (older cousin, "surrogate father," to four
children); United States v. McGee, 802 F. Supp. 843 (E.D.N.Y.
1992) (defendant raising nephew abandoned by father). Indeed,
variances and downward departures have been granted in cases with
arguably less mitigating circumstances than ours. For example,
in United States v. Pagan, 2000 U.S. Dist. LEXIS 4781 (S.D.N.Y.
2000), the court granted a departure to a defendant whose
children were in foster care but depended emotionally on her
daily visits and on the hope that she might one day gain custody
of them. The impact on these six children weighs heavily in
favor of a probationary sentence, particularly when viewed in
combination with the non-violent, non-drug related nature of the
offense, the length of time since the offense ended, and Ms.
Manigault's complete rehabilitation. While Ms. Manigault's
boyfriend is scheduled to be released from prison in February, it
is unlikely that he will be able to care for all six children,
particularly for an extended period. He will be released with no
job, and with very strict requirements of supervision. Mr.
Cordon is committed to doing all that he can to care for these
children, but it is unrealistic to think that he will be able to
get back on his feet and take care of six children ranging in age
from 2 to 17.

Incarcerating Ms. Manigault would mean the imprisonment of
someone who poses no risk of recidivism, who has evinced complete
remorse, and who has already been punished significantly by a
felony conviction that will keep her from most gainful
employment, even after she earns a college degree. It would mean
that six minors, ranging in age from 2 to 17, three of whom have
already been left parentless, would have no one to care for them,
take them to school, help them with their homework, feed and
clothe them, or take them to church. The letters submitted to
the Court and the PSR demonstrate that Ms. Manigault is not only
indispensable to the upbringing of these children, but that she
is an excellent parent. See Letter of Cameron M. Cordon,
attached as Ex. B; Letter of Karen P. Williams, attached as Ex.

D.; Letter of Monica Moore, attached as Ex. I.  Society's
interests will best be served by keeping these six children out
of the foster care system, by not repeating the cycle of parental
absence and instability present in Ms. Manigault's childhood, and
by recognizing that she has endeavored to make up for her past
wrongs and will continue to do so, in large part out of love for
her family and a realization of the impact of parental behavior
on children.

The Sentencing Guidelines, which in this case advise a
sentence of 37 to 46 months, based almost entirely on uncharged
tax loss, do not take into consideration Ms. Manigault's family
circumstances, her post-offense rehabilitation, her non-5K
cooperation with the Government, or her extraordinary acceptance
of responsibility, all of which bear directly on the sentence
necessary to punish, deter, and rehabilitate this particular
defendant.

A probationary sentence would not cause an unwarranted
sentence disparity, given the particular characteristics of this
defendant and her family circumstances.  Tax fraud convictions
are susceptible to a wide range of sentences, based on the
particular nature of the defendants.  For example, the owners of
Cipriani restaurant were recently sentenced for a $10 million
dollar tax fraud.  The son, Guiseppe, received a three year
probationary sentence for this multi-million dollar fraud.  The
father received a conditional discharge.

No term of imprisonment is needed to deter, rehabilitate or
punish Ms. Manigault.  She will not commit future crimes, she has
rehabilitated herself, and she is very aware of the wrongfulness
of her conduct, its seriousness, and the impact of such behavior
on the American Government and fisc.  Nor is such a term of
imprisonment needed for general deterrence.  Ms. Manigault has
spoken to every one in her life about the wrongfulness of her
conduct, and about the fact of her felony conviction – her
family, her siblings, the people she knew who were engaging in
this same scheme and whom she identified for the IRS, her church,
and her older children.  They know that she has been under
investigation and now prosecution for a number of years and that
she has received a federal felony for her conduct.  This is
sufficient general deterrence in this situation.

## VI.  <u>Conclusion</u>

We ask that the Court consider all of these factors – along with its own sense of what would constitute a fair and just sentence – in determining the appropriate sentence for Ms. Manigault.  <u>See</u> <u>United States v. Jones</u>, 460 F.3d 191, 195 (2d Cir. 2006) (noting that a sentencing judge may consider his or her own sense of what would constitute a fair and just sentence under all the circumstances, so long as all of the 3553(a) factors are taken into account).  It is rare to see a defendant who committed as serious an offense as Ms. Manigault did who has so clearly succeeded in changing her life, and done so by her own inner strength and resolve.  She should be acknowledged and supported.  Through her daily example she is likely to rescue more people – children and adults both – from the path of crime than any term of imprisonment could accomplish.  Octavia Manigault is a living example of redemption.  She touches the hearts and souls of all who come into contact with her.

Respectfully Submitted,


Deirdre D. von Dornum
Assistant Federal Defender
(212) 417-8767


cc:      Seetha Ramachandran, Assistant U.S. Attorney (via ECF)
         Katrina Minus-Shepherd, U.S. Probation Officer (via
              hand delivery)
         Octavia Manigault (via U.S. Mail)